(21 App. Div. 442.)

### GRIGGS v. DAY et al.

(Supreme Court, Appellate Division, First Department. October 22, 1897.)

1. PLEDGES—SUBSTITUTION OF COLLATERAL—EFFECT.

Plaintiff owned certain notes of a railroad company. He delivered them to G., defendants' testator, as security for advances. G. exchanged part of them with the company for its bonds, estimated on a basis of 75 cents on the dollar. It was claimed by plaintiff that this constituted a purchase

of the bonds by G. with such notes, and that G. thereby became the absolute owner of the bonds, and thereby plaintiff's indebtedness to him was canceled, to the extent of the face value of the notes. There was evidence that when the notes were issued to plaintiff they were regarded as a temporary expedient, until bonds could be issued to him to take them up, and that he knew of G.'s exchange of them for the bonds, and was present when that transaction occurred. *Held*, that the bonds, when issued to G., became a mere substitute in his hands for the notes, and were the property of plaintiff, and held by G. as collateral.

**2.** SAME—RATIFICATION—ELECTION—ESTOPPEL.

In G.'s journal were entries of credits to plaintiff which tended to support plaintiff's theory of the transaction. They were private entries made without plaintiff's knowledge or authority. During G.'s lifetime there was no ratification thereof by plaintiff. On previous trials of the action, plaintiff had insisted that they were not authorized by him. *Held*, that he could not thereafter ratify them.

**3.** SAME—CONVERSION BY PLEDGEE.

Part of the notes were not exchanged by G. for bonds, but were subsequently delivered up by him to the company, without consideration. *Held* a conversion by G. of the notes surrendered.

**4.** SAME—DAMAGES.

At the time of that surrender the notes had no value as obligations against the company. In surrendering them, G. did not surrender the claim against the company represented by them, but merely substituted for them an open account. *Held*, that there was nothing of value, capable of being reduced to a money standard, as a basis for computing plaintiff's damages.

**5.** SAME—DUTIES OF PLEDGEE.

Plaintiff had also delivered to G., as collateral, certain stock. Upon the erroneous theory that G.'s transaction with the notes had paid off plaintiff's indebtedness to an amount equal to their face value, he claimed that at a certain date his entire indebtedness was cleared off, and that the wrongful detention of the stock thereafter by G. prevented plaintiff's using the same, under a certain reorganization scheme, to secure shares of value in a new company. *Held* that, as plaintiff was in fact still largely indebted, G. was under no obligation to make any allowance or arrangement in that connection for plaintiff, and was not liable merely because he refrained from putting the shares into the reorganization scheme.

**6.** SAME—BREACH OF CONTRACT—DAMAGES.

G. agreed to furnish plaintiff the money necessary to enable him to complete, as contractor, the road of the company, whose stock G. was holding as collateral for plaintiff's indebtedness, and not to foreclose a mortgage on it until it was finished and earning interest. *Held*, that failure to perform would constitute a breach entitling plaintiff to recover only contractor's profits and the value of the stock held by G. as collateral.

**7.** SAME.

The stock had no value prior to the foreclosure, and no value in the reorganization, except on payment of $35 a share, which plaintiff never offered to pay, and which G. was under no obligation to pay for him. *Held*, that this item furnished no basis for damages.

Appeal from judgment on report of referee.

Action by Clark Robinson Griggs against Cornelius K. Garrison and others. On defendant Garrison's death, Melville C. Day and others, executors, were substituted. From a judgment for plaintiff for the sum of $685,240.50, entered upon the report of a referee, defendant Day and others, surviving executors, appeal. Reversed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Elihu Root, Horace Russell, Charles B. Alexander, Melville C. Day, and William R. Bronk, for appellants.

Joseph H. Choate, for respondent.

PATTERSON, J.　This action, brought in the superior court of the city of New York, has been tried three times, with widely-differing results.　It was begun originally against Cornelius K. Garrison, as the principal defendant, to compel an accounting by him of certain extensive and complicated financial transactions had by the plaintiff with him, and growing out of the construction and equipment of a railway for the Wheeling & Lake Erie Railroad Company, an Ohio corporation.　The plaintiff was the contractor for building the road, and Garrison was his banker,—that is to say, advanced all the money necessary for, and that was used in, the performance of the contract with the corporation.　The plaintiff, by the terms of the contract, was to have been paid in bonds and stock of the corporation at certain fixed amounts per mile; but the company, by reason of various changes of plans and increased expenditure caused to the contractor, became, during the progress of the work, indebted to him for large sums of money in excess of the original contract compensation.　In December, 1880, Garrison received an assignment of the contract, and of all the bonds and stock the plaintiff would be entitled to thereunder.　He took that assignment as security for loans then amounting to but $40,000, but afterwards the rights and things assigned became pledged to him for money advances made by him to the extent of millions of dollars.　A large amount of the bonds (being first mortgage bonds) Garrison purchased from the plaintiff under an option, and at an agreed price, and large quantities of stock were transferred to him as a bonus in connection with his purchase of bonds.　Afterwards he also became the owner of other shares by assignment or transfer from the plaintiff. The first mortgage bonds and stock owned by Garrison were necessarily drawn into the accounting, but, as the case is now presented, it is not required that detailed reference should be made to them.　In March and in November, 1882, instruments were executed and delivered by the plaintiff to Garrison in form vesting the latter with the apparent ownership of all the plaintiff's interest in and under the contract and some other property; but, notwithstanding the absolute character of the instruments, it has been satisfactorily shown that they were only security given to Garrison for plaintiff's indebtedness to him, and for a specific purpose which was not attained.　It must be held that the relations existing between the plaintiff and Garrison were those of pledgor and pledgee, except as to such securities as became the property of the latter by transfer expressly intended to operate a change of ownership, or by specific agreement.　The representatives of Garrison have not established their contention that he was the actual owner of all the plaintiff's interest in the enterprise.

The amended and supplemental complaints of the plaintiff proceed altogether upon the theory that the relation between himself and Garrison was that stated above, and no other.　The defendants in their answer denied their liability to account, and set up a large demand by way of counterclaim against the plaintiff.　Garrison died pending the first trial.　The executors of his will were substituted as defendants.　Garrison's wife was a party defendant, but is now out of the case.　The referee on the first trial stated the account between the plaintiff and Garrison, and found that the former was in-

debted to the latter on the counterclaim in over $2,000,000. Both parties appealed to the general term of the superior court from the judgment entered on that decision, and such judgment was reversed by a divided court on a question of fact which now again becomes a crucial one in the case. On a second trial, before another referee, it was held, on a restating of the account, that the plaintiff was entitled to recover against the Garrison executors the sum of $170,000. That conclusion was arrived at in consequence of the second referee considering himself bound by the decision of the general term, there being no essential difference in the evidence on the first and second trials as to that question of fact. The second judgment was affirmed by the general term (11 N. Y. Supp. 885), but on appeal to the court of appeals was reversed, on a ground which will be adverted to hereinafter, and a new trial was directed (32 N. E. 612). In denying a motion for a reargument, the court of appeals, with great vigor of expression, repeated its reason for the reversal of the judgment. 32 N. E. 1001. A third trial was had, before still another referee, who ordered the judgment now appealed from, and who found that in the account as stated by him there existed an indebtedness of Mr. Garrison's estate to the plaintiff of $670,116.30. That was reached by fixing the amount of all the advances made by Garrison at the sum of $4,414,156.40, and charging him with various items aggregating enough to leave a debit balance against him of the amount found in the plaintiff's favor. Included in the items so charged against Garrison are two, concerning which the principal contest has been waged between the parties. One is of $2,062,643.14, the amount of certain promissory notes of the Wheeling & Lake Erie Railroad Company, which were used by Garrison, and the other of $348,394.47, an alleged loss to the plaintiff caused by his being prevented from using hypothecated stock on the reorganization of the railroad after a sale under decree of foreclosure of the first mortgage on the property of the company. As the referee puts it in his opinion, the two main questions to be determined are: First, the effect upon the stating of the accounts of the use made by Garrison of promissory notes executed by the railroad company to the plaintiff, the contractor, for advances and extra work amounting to about $2,000,000; and, second, the liability of Mr. Garrison's estate for certain shares of stock which were hypothecated, and were not absolutely assigned, by the plaintiff to Garrison. The consideration of the case, as the referee's decision bears upon it, will be confined to those two items; for, if they were improperly credited to the plaintiff, the balance of the account, in its final adjustment, must be largely in favor of the defendant, and, on thorough and repeated examinations of the whole record, I cannot escape the conviction that the evidence does not warrant the conclusion the referee on the last trial reached respecting either of those items. The initial fact to be considered respecting the promissory notes is that prior to the 18th of April, 1883, Garrison had them in his possession as collateral security. Their issuance had been previously authorized by a resolution of the directors of the railroad company passed in December, 1881, by which, among other things, a committee was appointed to audit the claim of the

plaintiff for moneys advanced for right of way, materials, and labor; and the president was directed, on the approval of the report of the committee, to issue to the plaintiff, or "the assignee of his contract," nonnegotiable certificates for the amount reported due. It is unnecessary to refer to the separate amounts, or dates of issue, or other details of these notes. Contrary to the resolution, they were emitted in negotiable form, were indorsed by the plaintiff, and delivered to Garrison. On the 18th of April, 1883, Garrison sent a communication in writing to the railroad company, asking for the settlement of the cash advances he had made, and which were enumerated in a statement forming part of the communication, and in which were included the amounts of those promissory notes. At a meeting of the directors of the company held the following day, Garrison and the plaintiff were present. The former proposed to take, in partial liquidation of his claim, second mortgage bonds of the company at 75 cents on the dollar, whereupon Mr. Wickham, a director, moved, and his motion was·adopted, that the president of the company be authorized "to sell and deliver to C. K. Garrison second mortgage bonds to the amount of $2,280,000, at the rate of seventy-five cents on the dollar, and interest accrued from March 1, 1883; the same to be delivered in part payment of his claim against the company, amounting to $2,449,912.68, this day specified in his communication to this company." In May, 1883, the transaction contemplated and provided for by the resolution was consummated, and Garrison received second mortgage bonds upon giving up all the promissory notes held by him, except to an amount of $326,043.13, which he retained for some time, and afterwards, and without receiving any consideration for them, also surrendered to the company, and they were canceled.

The inquiry upon the answer to which the case at this point depends is, what was the real nature of this transaction between Garrison and the railroad company, as distinguished from the mere formal expression of its character as stated in the resolution; or does the language of the resolution correctly state what that transaction was? Whatever it was, it was made with the plaintiff's knowledge. He claimed neither to have approved of nor objected to it at the time, but to have remained passive while it was in negotiation, and until its completion. His position with respect to it now is that by means of it Garrison became the purchaser, individually, of the second mortgage bonds; that he bought and paid for them by the promissory notes at an agreed price; and that that effected the payment of the plaintiff's debt to him to the amount of the face value of the notes for which the bonds were given. The defendants contend, on the other hand, that the transaction was nothing but the exchange of one form or kind of evidence of indebtedness for another, and that the second mortgage bonds came into the possession of Garrison, and were held by him, only as security, and in the same way and subject to the same arrangements and conditions upon which he had possession of the promissory notes. On the first trial the referee held that Garrison was not a purchaser from the company of the second mortgage bonds, or, rather, that he was unable to find that Garri-

son was such a purchaser. The majority of the general term judges considered that:

"The manner in which the arrangement was carried out, according to the evidence which the defendants cannot contradict, shows that, so far as Garrison was concerned, and so far as he could bind the plaintiff by his acts, he bought the notes of the plaintiff, and then used them to buy the bonds for his own individual benefit."

The referee on the second trial could not do otherwise than follow the decision of the general term on that question of fact. On the appeal to the court of appeals that tribunal did not, in its opinion, as reported, consider or discuss that question, but held that, in the most favorable aspect of the case to the plaintiff, it was only shown that Garrison had wrongfully converted the notes, and that, as there was no proof of their value, the judgment must be reversed. On the third trial the referee passed upon the question anew, placing his decision upon what he regarded as new proof of the character of the transaction and of the value of the notes. That assumed new proof, it may be said, consists in reality only of the testimony of Wickham, the director who offered the resolution at the meeting; and his testimony, apart from his own characterization and conclusion as to the nature of the transaction, is, in substance, nothing more than is contained in the language of the resolution itself. There is no vital change in the proofs brought about by the so-called new evidence, for the affidavit of Gerau and the testimony of Wilson add nothing to the strength of the plaintiff's case on this point. The plaintiff was present at the directors' meeting when the resolution was passed, and did not object to the transaction. To escape from the inevitable effect of the decision of the court of appeals, it was incumbent upon the plaintiff to show on the third trial, at least, that some new relationship was established of Garrison with reference to these notes. The referee's summing up of the matter, stated in his own words, is:

"That Garrison caused the plaintiff's claim to be reimbursed by his principal for advances, to be reduced to negotiable form, and took it as collateral security for the plaintiff's obligation to pay him. He then presented it as his own claim against the company for advances, and extinguished it in consideration of payment in a new and more favorable form of security, payable to himself. He thus, in legal effect, collected from the company the advances he had made through the plaintiff, and the liability of the agent was extinguished with that of the principal. The detriment to the plaintiff appears plain. He stood charged for the company's indebtedness, and his power to collect from them was taken from him as collateral security, and used to extinguish that very indebtedness. So far as he stands charged with what was the company's indebtedness, he is charged by the use of the collateral, even if Mr. Garrison did not realize as much from the new obligations as he expected."

It will thus be seen that the referee did not put his decision on the ground that Garrison first bought the notes from the plaintiff, and then the bonds from the company, making payment by or with the notes, as the general term had held, but that Garrison bought the bonds directly from the company with the notes, and thereby extinguished the company's debt to the plaintiff. The legal relation of the parties, as described in the statement quoted from the referee, is not the situation that I find, in the facts, existed between them. A crit-

ical study of all the evidence—that taken on the first and second (and it is all before us) as well as on the third trial—induces me to form an entirely different conclusion as to that relation and situation. The beginning of the history of the second mortgage bonds, and the project of using the promissory notes in connection with them, antedates by some time the day of the passage of the resolution at the directors' meeting. Those bonds were, in their origin, designed and intended to take up or fund the general indebtedness of the railroad company, including the very promissory notes in question. There seems to be no doubt of that, and the plaintiff knew it to be so, and was one of the originators of the scheme. Mr. Noah Swayne testified that he was present at a conversation between the plaintiff and Garrison relating to the manner in which the account should be settled with the company. He was a lawyer in consultation with both the plaintiff and Garrison on that subject. He advised waiting until second mortgage bonds could be prepared. The question of the price at which they should be taken was discussed. Garrison preferred not to wait until bonds could be in readiness. He wanted notes made for the purpose, or to stand as a statement of account. "It was only having notes taken just as a mere temporary expedient until the mortgage could be issued. * * * It was just a mere temporary expedient under the contract." And McDonald swears to a conversation between himself and the plaintiff relating to the giving of notes or certificates, and that they "were to come first, and some means to be gotten up—a mortgage—to retire them." In the very inception of the purpose of issuing second mortgage bonds, the feature of substituting them for notes was in the contemplation of the plaintiff, as part of the scheme. He so testifies. He says the second mortgage bonds were intended to supplant the general indebtedness of the company, or the indebtedness to him, and that such was the fact when the bonds were issued, and that that arrangement never was disturbed; and he stated in an affidavit made in July, 1883, that Garrison held the bonds in lieu of the notes. There was also evidence that that was the nature of the transaction as it came before the directors' meeting. Woodford says that at that meeting the most important subject spoken of "was the exchange of certain notes of the company which Commodore Garrison held for second mortgage bonds." Garrison's action in taking the bonds is altogether consistent and in conformity with the original purpose of issuing them. It seems to me that the whole arrangement at the directors' meeting took on the mere form of a purchase and sale. It was necessary to fix a price. The bonds could not be issued at a lower rate than 75 cents on the dollar, under the law of Ohio. The plaintiff knew that the indebtedness was to be funded. Garrison's communication refers to his advances to it, but, with the exception of $304,000, those advances were made to the plaintiff, not to the company, and Garrison was dealing with the notes in the same way Swayne says they were intended to be used. I think the proof fails to justify the referee's finding, and would authorize one that, as between Garrison and the company, the transaction was only a change in the form of the evidence of indebtedness and the amount thereof; and, as between the

plaintiff and Garrison, the proof fails to convince me that it was anything more than that. It was made with or without the assent of the plaintiff. In the former event, he is not entitled to the credit the referee has given him. In the latter, there would be, as the court of appeals held, a conversion of the plaintiff's notes, leaving Garrison liable for their value, and there is no new evidence of value that would justify charging his estate with the enormous sum the referee has found against it. The notes, when they were used, were worthless as obligations upon which anything could then be realized, and after that the second mortgage bonds were of no more intrinsic value than the notes. In deciding that the bonds were purchased by the notes, the referee has apparently ignored all the important evidence taken upon the previous trials and put in by the defendants. He seemingly was influenced by the following considerations, viz.: First, his construction of the conduct and attitude of the parties, viewed from the plaintiff's shifting standpoint alone; second, a supposed inducement impelling Garrison to make the transaction, in substance, as a purchase, and not an exchange of securities; and, third, entries contained in Garrison's books of account. But those considerations neither singly nor collectively are sufficient. It is perfectly plain that Garrison never became the owner of the notes. The plaintiff's position all through the litigation, before the last trial, has been directly opposed to the idea that the notes themselves were ever sold to Garrison. There is not a word of evidence to justify the belief that there ever was any understanding on the part of the plaintiff that Garrison had bought them. The whole claim that he purchased anything must depend simply, as the last referee distinctly saw, on the use made by Garrison of them, and his acts in connection with them. In my judgment, the referee was not justified, on the whole evidence relating to this subject of the acts and relations of the parties, in finding, as he has done in his decision, that "the directors sold and delivered to Garrison, and Garrison bought from them, second mortgage bonds of the face value of $2,280,600, at the price of seventy-five cents on the dollar," and that "this sale and delivery to him was in part payment of the claim he had presented against the company for advances made, represented by the notes." If the form of the resolution alone controls, he is right; but, the whole subject being open, if the entire history of the matter is considered he is wrong. On the whole proofs on this branch of the case, it is nothing less than grievously unjust to treat this transaction as an extinguishment of so much of the plaintiff's indebtedness to Garrison as equaled in amount the sums for which the notes were drawn.

But it is further assumed that there existed a very potent reason for Garrison's becoming a purchaser of those second mortgage bonds. He was in control of the Wheeling & Lake Erie Company. The majority of the directors were in his interest, and of his selection. Negotiations, which resulted in nothing, were on foot for the sale of the road to what is called a "Vanderbilt Syndicate." One of the proposed terms of the anticipated sale was the guaranty by that syndicate of the mortgage securities of the Wheeling & Lake Erie Company. It would undoubtedly have been of great advantage to Gar-

rison to have the unsecured and really worthless notes transmuted into securities that would become at once accredited and made valuable by such a guaranty. A purpose to buy the bonds with the notes is therefore claimed to be apparent. But the inference is inconclusive. No agreement of guaranty was ever made, and that hoped for would have been quite as effectual whether Garrison held the bonds as security or as their owner. If his object were as claimed, how is it to be explained that only $1,736,600 of the notes were used in the transaction, and not the remaining $326,000, which Garrison subsequently surrendered without any consideration whatever? But, again, the bookkeeping entries were regarded as fixing the real nature of the transaction. I agree with the referee on the first trial that altogether too much importance has been given to those entries. In Garrison's journal, under date of May 1, 1883, is an entry crediting the plaintiff with $1,546,982.35 on his indebtedness to Garrison. There is also in the same book, on the same date, after a statement of the notes and interest, the following entry: "This amount of notes and interest taken from the contractor at 75%." There is also an entry on Garrison's books against the company for the full amount of the notes and interest, and a credit of the amount at 75 per cent. of the notes turned in for bonds. These entries, standing alone, purport to show that Garrison first took the notes from the plaintiff at 75 cents on the dollar, and then took for them, at their face value, the second mortgage bonds of the company, at 75 cents. Now nothing is plainer or clearer in this case than that such a transaction never occurred. Garrison never took the notes from the plaintiff, by purchase or agreement, at any price. Why the entry was made can only be conjectured. The entry relating to the company is but a mere record of the bare transaction. It is sufficient, without further comment, to repeat what the court of appeals said as to these entries, viz.:

"That they have very little bearing on the controversy between the parties. They were private entries made by Garrison without the knowledge of the plaintiff, and without his authority." "They show that Garrison intended to take the notes at 75 cents on the dollar, and was willing to allow the plaintiff that sum for them, but there was no actual purchase of them. If that entry had come to the knowledge of the plaintiff, and he had adopted it, and so notified Garrison, he could probably have held him to a purchase of the notes for that sum." "He cannot use that entry to fasten upon him a purchase of the notes at their face value. The minds of the parties never met on such a contract."

There was therefore no purchase of the notes from the plaintiff. As stated before, there was a purchase from the company, with consequences and a legal situation such as was assumed to exist by the referee on the last trial, or there was a mere exchange of the notes for the bonds, with those bonds held by Garrison in precisely the same way in which he held the notes; and I am compelled to believe the latter was the real situation. There never was, during Garrison's lifetime, a ratification of the entry in his journal concerning the notes. All the way through the controversy, until the last trial, the plaintiff has insisted that the entry was not authorized. He repudiated the idea of a sale at that figure. Now his position is changed,

and he declared at the last trial that he then ratified and adopted the transaction. It was too late. He had long before made his election to repudiate it. He cannot now take the attitude that Garrison should be held liable as a purchaser, even at the price stated in the entry (which is the only amount he could, in any event, claim, for he would be obliged to ratify it as made, or not at all), for he had elected not to ratify it, and is bound by his choice.

There is but one thing more to be said on this topic, and that relates to the acquiescence of the plaintiff in the exchange. The referee on the last trial states in his decision that:  ·

"The plaintiff was present on the occasion of the meeting of the directors of the company when the transaction was had, and the act of Mr. Garrison in so using that amount of the notes was with the plaintiff's knowledge and acquiescence, and Mr. Garrison was not guilty of an actual or technical conversion of that part of the notes."

In this conclusion of the referee (the real nature of the transaction being ascertained) I entirely agree. The evidence is convincing that the plaintiff did know of, and did acquiesce in, what was done at the directors' meeting, in the act by which the exchange was accomplished, and he knew that the purpose and intent of that act were merely to effect an exchange; and thus the subject of the conversion of those notes disappears from the case.

But with regard to the $326,043.13 of notes delivered to the company without consideration there indubitably was a wrongful conversion by Garrison. The last referee has charged against his estate the whole face value of those notes and interest. It was held by the referee on the second trial that their surrender operated the substitution of the railroad company in the place of the plaintiff as Garrison's debtor on an open account, or, in other words, a novation was brought about. The referee on the last trial held that the effect was to transfer the amount "to an open account against the company in favor of, and controlled exclusively by, Mr. Garrison, thus precluding the plaintiff from subsequently making any claim against the company, and to extinguish the legal liability of Mr. Garrison as a stockholder to any other person, while preserving the entire indebtedness of the company to him, nearly all of it being represented by securities of the company owned by him, and which he could negotiate without danger of liability"; and he further held that "this dealing with the securities entitles the pledgor to be credited with the entire amount against the indebtedness." I am unable to find any new evidence changing in any way the character of the transaction of the surrender of the $326,000 of notes, so far as the general question of value is concerned. Irrespective of the particular consideration of there being a special value to them, we are bound, I think, by what the court of appeals said concerning them, viz.:

"That they had no value as obligations against the company, and it is preposterous to suppose that Garrison intended by the surrender to charge himself for their face value, against an indebtedness of the plaintiff to him for money actually loaned. By the surrender he did not intend to release the company from its indebtedness evidenced by the notes, but he intended and elected still to hold the indebtedness evidenced by his charge in open account upon his books. The obligation of the company was not impaired or lessened by the transaction, and it owed just as much after as before. Even if he made

the notes his own by surrendering them, there was simply a conversion of them. * * * He did not take a new debtor, but he retained, and intended to retain, the same debtor. Here was no novation, and nothing resembling it."

I see nothing in the entire case that changes the character ascribed to this feature of it by the court of appeals. It was a conversion, and nothing else; and, as that court said, the damages recoverable are "the value of the notes converted. There can be no other measure, as that measures the entire damage of the plaintiff absolutely." But the referee has decided, in substance, that the benefit to Garrison by his being relieved of a contingent statutory liability to creditors of the company to the amount of these surrendered notes is evidence of a special value which may be awarded as damages. The court of appeals did not comment on that particular phase of the subject. It is claimed that Garrison, by changing the form of indebtedness, extinguished his liability. But what value exclusively pertained to the notes by reason of Garrison's statutory liability that would not belong to an indebtedness of the company in any other form? He was so liable by statute for all the debts of the company,—as well those resting in open account as those evidenced by promissory notes. If the surrender of the notes and their cancellation destroyed the company's liability on them, that liability still remained for the amount charged in account. Garrison's act and the entry in his books did not necessarily pay the company's debt to the plaintiff. On the redemption by the plaintiff of that which Garrison held as pledgee, the claim against the company would revert to the plaintiff, by operation of law, and there would not even be a question of compelling an assignment. The plaintiff or his successor in interest would have been quite as able to enforce the stockholders' liability for the debt in the shape of an account against the company as in the form of promissory notes. There was nothing, therefore, of value, capable of being reduced to a money standard, in this transformation of the indebtedness, and the referee was in error in allowing any part of the item of the promissory notes.

The referee's allowance to the plaintiff of the sum of $348,394.47 for the stock was based upon several considerations. He decided that at the time a reorganization of the railway company was effected, in October, 1886, the plaintiff's debt to Garrison had been paid, from which it would follow that Garrison's executors had no right to further detain from the plaintiff his collaterals. He also decided that the plaintiff had made demands for an accounting, and other efforts to get back his securities, and that had they been released, as should have been done, he could have used the shares of stock in such a way, under the reorganization scheme, as would have entitled him to other shares in a new company, which other shares he could have sold at a figure which would have produced the sum allowed. The referee also decided that Garrison's executors failed to perform an agreement their testator had made with the plaintiff, to refrain from foreclosing the first mortgage until the road was completed, according to the terms of the plaintiff's contract, with moneys to be advanced by Garrison for that purpose, and that Garrison had broken his agreement to advance such moneys. The referee also decided, but made no practical application of it, that Garrison's executors were liable for discriminat-

ing in the reorganization against the plaintiff's stock in the old company, which, to the extent of 24,342 shares, they held as collateral. The finding that the plaintiff's debt was paid was the consequence of the credit given for the amount of the promissory notes. The referee, in the schedule annexed to his report, gives that credit of $2,062,643.13, and finds a balance due plaintiff, as of May 1, 1883, of $347,276.12. We have seen that the large credit was improperly given, and hence the foundation of the referee's finding now referred to is removed. The reorganization was accomplished pursuant to the terms of a proposition submitted by the persons who were the executors of Garrison's will, and who, as such executors, held the shares as collateral. They were acting for, or in the interest of, the estate; but, as simple pledgees, they were under no legal obligation to make any allowance or arrangement for the benefit of their debtor, the pledgor. Nor was he entitled to arrest or delay the reorganization by his demands, either for the securities, or for an accounting. The executors proceeded at their peril, and if the estate of their testator were indebted to the plaintiff, or if they were wrong in refusing to give him his hypothecated shares, the result reached by the referee would have been justified. But the plaintiff's debt was not paid, and the executors were not bound to give him participation for those shares in the new scheme. He was still debtor to a very large amount to Garrison's estate, and they are not liable merely because they refrained from putting those shares into the reorganization.

But the referee has held that Garrison and his executors were under an agreement, which was broken, to furnish all the money necessary to complete the original road and put it in operation, and not to foreclose the first mortgage until the road was finished, and earned income sufficient to pay interest. Upon that finding the referee has built up an equity by means of which he has seen his way to allowing this item of damage for the shares of stock. That alleged agreement is claimed by the plaintiff to have rested altogether in mere verbal declarations of Garrison. Not one word of writing is produced to substantiate or give color to it. According to the amended complaint, a part of it had its origin in December, 1880, when the assignment of the plaintiff's contract and stock was made to Garrison. It is alleged that Garrison then "agreed to furnish the necessary means as they were required by plaintiff to complete his contract." Subsequently, the complaint alleges, Garrison, from time to time, made new demands for more stock, under threats of ceasing to advance more money, and in September, 1881, threatened to foreclose the road under the first mortgage unless the plaintiff would give him many thousand more shares of stock. It is also alleged that the plaintiff complied with that request, and those allegations are the basis of the plaintiff's claim, and of the referee's finding that there existed a collateral agreement between the plaintiff and Garrison that the latter was to complete the road, put it in paying condition, and that, notwithstanding any future contingency or new situation, he bound himself to the completion of an immense undertaking, from which he would be content to receive only his advances and 6 per cent. interest on the amount thereof. The inference is, of course, intended that Garrison would also profit by making his

stock valuable. The referee fixes the time at which he states the agreement was made. He says:

"About the time of Mr. Garrison's approval of the contract, and taking the transfer, assignment, and option, he told the plaintiff that, if he undertook the enterprise, he wanted to build a first-class road, to keep, and not for speculation; that he was able to pay for the increased expense of building the road better than was required by the contract; and that he would carry the interest coupons until the road was built and had earned interest. And I find that in consequence of this promise, and of his undertaking to finance the enterprise by making advances to the plaintiff for that purpose, the plaintiff undertook the course of dealing that was carried on between the parties."

He subsequently, in his decision, refers to the promise as one "to carry the bonds and prevent foreclosure until the road should be built, and thus maintain the value of the bonds and stock." He therefore found, in effect, that this alleged verbal agreement survived all the changes made in the carrying out of the enterprise; that it was to be binding on Garrison and his estate, no matter what checks or disasters or financial reverses or modifications of the undertaking might happen in the future. As said before, there is not one word of written evidence to establish such a contract; and so far as proof of its existence depends upon the unsupported statement of the plaintiff, or upon casual declarations said to have been made by Garrison of his intentions and purposes, I attach no weight to the testimony. There is corroboration of the plaintiff's statement that at some time prior to May, 1882, Garrison had made some kind of a promise to the plaintiff in connection with building the road as it was provided it should be built by the plaintiff's contract with the company. On the last trial, Mr. Oliver, who had been the general manager of the company, gave new testimony on the subject. He says that in May, 1882, on the occasion of a trip for inspection over a railway, he had a conversation with Garrison, who stated:

"That he felt secure in carrying the bonds until such time as the road would develop such business as he knew it would do, and take his chances of getting his pay from the earnings to make good the deficit which might accrue during the time the road would not pay its way, and that he had agreed to do this, and felt no doubt about the result. He said in the same conversation that he had promised Mr. Griggs he would do this."

This witness also swore that Garrison said he had agreed with the plaintiff to furnish the money to complete the road, and that the plaintiff and himself were the owners of nearly all of the stock of the road. Even giving full effect to Oliver's testimony, the sweeping and radical agreement found by the referee to have been made is not established. I have no confidence in the plaintiff's testimony as to the terms of the alleged agreement, not because that testimony is deliberately false, but for the reason that any observant person reading the record cannot fail to perceive how his narrative grew and expanded from day to day; how one suggestion led to another,—the wish being father to the thought, and the thought bringing forth the imagined memory,—until the perfected terms became evolved from three separate conversations, one had about the time the referee fixes, another on the occasion of Garrison's objecting to the plaintiff's receiving his 10 per cent. contractor's profit, and still another at the time Garrison required the road

to be built in a superior and more costly method of construction to that originally intended.     Everitts' testimony on this point relates to a conversation had with Garrison in 1881, and Jenkins was shown on cross-examination to have so poor a memory that his recollection of dates is not to be relied upon.     But assuming some vague or even definite promise was made by Garrison to complete the road according to the contract, and to furnish the money for it, his failure to do so does not make his estate liable for the shares held in pledge by the executors, in the manner or to the extent the referee has held them to be liable.     The promise was to complete the road as projected between the terminal points provided for in the contract, and in three branches or divisions.     One of those branches, between Bowerstown and Wheeling, was not built.     The promise to build that portion was made by Garrison, the plaintiff says, in the winter of 1881 or 1882, or during those years.     Whatever Garrison's intention and promise may have been, it is clear that in the summer of 1882 it was abandoned.     The plaintiff says:

"Garrison told me that, as he had purchased the Cleveland & Marietta road, it would furnish all the coal traffic that was required on that portion of the Lake & Erie road that was built, and it was unnecessary to continue it on to Wheeling."

That purchase of the Cleveland & Marietta road was of a substantially parallel line to that projected from Bowerstown to Wheeling, and answered all the purposes and supplied the place of that branch; and the evidence shows that the plaintiff so understood it, and he acquiesced in the purchase, knowing why it was made, and that upon the acquisition of the purchased property it would not be necessary to complete the whole road as provided for in his contract.     By his conduct he waived the performance of so much of Garrison's promise as would have required him to furnish the money to complete that branch of the road.     But assume he did not, and what would be the consequence?     Merely a breach of the contract to build, or to furnish the money to build, which would have entitled the plaintiff to recover the contractor's profits on that branch of the road (which profits the referee had refused to allow), and damages for the breach of the contract to prevent foreclosure, which would be the value of the shares; and they did not have any value whatever prior to the foreclosure, and had no value in the reorganization, except on payment of $35 a share, which he never offered to pay, and which the defendants were under no sort of obligation to pay for him.     The two items discussed must therefore be expunged from the account, thus leaving an apparent balance in favor of the defendants on the account of over $2,000,000. But the evidence is not in such condition as to enable us to determine what credit, if any, should be given the plaintiff on that balance.     The use, if any were made, by the defendants, of the second mortgage bonds, in the reorganization, would materially affect that subject. That matter is not before us, and hence we cannot direct a judgment upon the counterclaim.

The judgment must be reversed, with costs, and the complaint dismissed on the merits, with costs.     All concur.